UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| MORAN INDUSTRIES, INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | No. 1:10cv56 |
| | ) | Edgar / Carter |
| MR. TRANSMISSION OF | ) | |
| CHATTANOOGA, INC., RODNEY B. | ) | |
| RANDALL, DAVID JASON RANDALL | ) | |
| d/b/a JASON RANDALL'S | ) | |
| TRANSMISSION SERVICE | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM**

Plaintiff Moran Industries, Inc. ("Moran") brings this action against Defendants Mr. Transmission of Chattanooga, Inc. ("MTC"), Rodney B. Randall, and David Jason Randall d/b/a Jason Randall's Transmission Service ("JRT") (collectively "Defendants") for breach of a franchise agreement and for trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125. Plaintiff's claim for breach of the franchise agreement is brought solely against MTC and Rodney Randall. *See* [Court Doc. No. 45, First Amended Complaint ("Amended Complaint")].

Defendants Rodney Randall and MTC now move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the portion of Count I of the Amended Complaint that relates to Plaintiff's attempt to recover lost future royalties and marketing fund payments from Defendants. [Court Doc. No. 47]. Plaintiff Moran opposes the motion to dismiss. [Court Doc. No. 50].

The court has reviewed the Amended Complaint, the arguments of the parties, and the relevant law determines that Defendants' motion will be **DENIED**.

**I.      Background**

Because this is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) the court has only reviewed the Amended Complaint and its accompanying exhibits to determine whether Plaintiff has alleged a claim for future royalties and marketing fund payments which can be granted.  Plaintiff Moran is an Illinois corporation and Defendants MTC and Rodney Randall are citizens of Tennessee.  Amended Complaint, ¶¶ 1-2.  Moran is in the business of franchising transmission service centers called "Mr. Transmission Service Centers."  *Id.* at ¶ 8.  Mr. Transmission stores sell, service, and install products relating to automobile transmissions.  *Id.* at ¶ 9.  Moran owns the trademark, service mark, and trade name "Mr. Transmission" and monitors the stores so that they are operated with standard designs, systems, and procedures.  *Id.* at ¶ 10-12.

Moran licenses the service mark "Mr. Transmission" to its franchisees and discloses its proprietary business system, standards, and specifications to its franchisees in its Operations Manual.  Amended Complaint, ¶¶ 13-14.  Moran also maintains a national warranty program in which the franchisees are required to participate.  *Id.* at ¶ 15.

The Amended Complaint alleges that on June 1, 1982 Rodney Randall entered into a franchise agreement with Mr. Transmission, Inc. ("License Agreement") under which Rodney Randall received the right to operate a Mr. Transmission franchise for twenty years in Chattanooga, Tennessee.  Amended Complaint, ¶ 16.  Rodney Randall is alleged to be the sole shareholder of MTC.  *Id.* at ¶ 17.  On April 3, 1989 Rodney Randall entered into an Addendum to the License Agreement.  *See* [Court Doc. No. 45-2, Addendum].

Mr. Transmission, Inc. assigned its rights under the License Agreement to Moran on

August 14, 1990. Amended Complaint, ¶ 19. On the same date, Rodney Randall consented to the assignment of the License Agreement from Mr. Transmission, Inc. to Moran under a License Agreement Modification and Consent to Assignment Agreement. *Id.* at ¶ 20. Together, the License Agreement, Addendum, and License Agreement Modification and Consent to Assignment constitute the entire "Randall Franchise Agreement."

On June 25, 2002 Rodney Randall renewed the entire "Randall Franchise Agreement," and for around twenty-seven years, Rodney Randall, through his corporation MTC, operated a Mr. Transmission franchise in Chattanooga, Tennessee. *See* [Court Doc. No. 45-4]. He paid a weekly royalty fee of the gross receipts from the operation of the store as outlined in the Randall Franchise Agreement. Amended Complaint, ¶ 23.

Under the terms of the Randall Franchise Agreement, Rodney Randall and MTC agreed to take on several obligations in exchange for the right to use the name "Mr. Transmission" and for access to the proprietary operation information of Mr. Transmission, Inc. and later, Moran. *See* [Court Doc. No. 45-1, License Agreement].

Under Section 6 of the License Agreement, Rodney Randall agreed that he would "commit no acts which in any respect infringe upon, harm or contest the right of Licensor in the proprietary mark or in any other mark or name which incorporates the name "MR. TRANSMISSION." License Agreement, § 6. This Section of the agreement continues by stating:

> All the rights and privileges granted to LICENSEE herein are for LICENSEE'S enjoyment at the location described in paragraph number 1 and nowhere else, and LICENSEE shall never (either during the term of this License Agreement or after its expiration or termination) use or attempt to use the name "MR. TRANSMISSION" or "MR. TRANSMISSION SERVICE CENTER" or any variation of such name or any other trademark or service mark of LICENSOR in

any manner whatsoever, except in connection with the operation of the MR.
TRANSMISSION SERVICE CENTER herein licensed.

License Agreement, § 6.

Section 10 of the License Agreement contains the core of the parties' dispute concerning future royalties. License Agreement, § 10. That section states in relevant part:

> Beginning at the time that LICENSEE opens its center for business through the first five (5) years of this Agreement, LICENSEE shall pay to LICENSOR, in weekly amounts, service charges in a sum equal to seven percent (7%) of the gross receipts derived from the operation of LICENSEE'S Service Center during the preceding calendar week. (As provided in paragraph number 3, this service charge may be increased by the LICENSOR each five-year period of this Agreement.)

*Id.* Although paragraph 3 is referenced in Section 10, the Section of the License Agreement numbered Section 3 does not appear to pertain to increased royalty amounts, but rather pertains to the twenty year term and to the automatic extension of the License Agreement. *See id.* at § 3.

The Addendum entered into by the parties on April 3, 1989 also pertains to Section 10 of the original License Agreement. *See* Addendum. The Addendum adds the following statement to Section 10 of the License Agreement: "The service charges shall be reduced to five (5%) percent for standard transmission, clutch work, and national fleet and wholesale accounts under the following terms and conditions: . . . ." *Id.* The Addendum then proceeds to outline seven specific terms and conditions that relate to the reduction in the service charge. *Id.*

Rodney Randall also agreed to contribute one percent of his monthly gross receipts up to a maximum of $100.00 per month to a national advertising fund. *Id.* at § 15(a). He further contracted to keep confidential proprietary information regarding the operations of Mr. Transmission franchises and to return the operating manual to Moran following the termination of the License Agreement. License Agreement, § 18. The License Agreement further contains

strict terms regarding how the agreement could be assigned to other individuals. *Id.* at § 19.

The License Agreement contains provisions relating to its termination by Moran. It states in relevant part:

> (a) Upon the happening of any of the following events, this Agreement shall, at the sole discretion of LICENSOR, immediately terminate upon receipt of LICENSEE of written notice of termination:
> (1) Any breach or failure by LICENSEE to perform any obligation under this License Agreement including exhibits, schedules and appendixes [sic], or failure by the LICENSEE to comply with rules, regulations, or directives promulgated by MR. TRANSMISSION, INC. . . .
> (5) Without limiting the provisions of paragraph (a)(1), if the LICENSEE closes his MR. TRANSMISSION SERVICE CENTER for any reason whatsoever and fails to reopen within ten (10) days from the date of such closing,
> (6) Without limiting the provisions of paragraph (a)(1), if the LICENSEE attempts to sell, sells, or transfers or assigns any of his rights under this Agreement without approval of LICENSOR as provided in paragraph 19 of this Agreement, . . .

License Agreement, § 23(a).

The parties agreed to be bound by the laws of Tennessee in interpreting the agreement, and Mr. Randall agreed to pay reasonable attorneys' fees and costs associated with the enforcement of the provisions of the License Agreement. License Agreement, ¶¶ 25, 32.

In February of 2009, Rodney Randall began to consider retiring from running his Mr. Transmission franchise. Amended Complaint, ¶ 29. The parties then exchanged correspondence regarding Mr. Randall's possible retirement. Moran wrote a letter to Mr. Randall in April of 2009 explaining his options regarding his Randall Franchise Agreement assignment. *See* [Court Doc. No. 45-5].

The Amended Complaint alleges that "[o]n or around August 3, 2009, Rodney Randall, without the knowledge or consent of Moran, abandoned the Franchise Business and transferred assets of the Franchise Business to his son, David Jason Randall." Amended Complaint, ¶ 31.

On August 4, 2009 Moran sent a letter to Mr. Randall terminating the Randall Franchise Agreement. [Court Doc. No. 45-6]. The Amended Complaint alleges that on August 3, 2009, Jason Randall began operating JRT out of Rodney Randall's former Mr. Transmission shop location using the same assets and equipment found in the former Mr. Transmission store. Amended Complaint, ¶ 33. Moran claims that Rodney Randall owes it $253,240.83 in lost future royalty payments. Rodney Randall and MTC move to dismiss Moran's claims relating to future royalty payments.

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court "must read all well-pleaded allegations of the complaint as true." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996)). In addition, a court must construe all allegations in the light most favorable to the plaintiff. *Bower*, 96 F.3d at 203 (citing *Sinay v. Lamson & Sessions*, 948 F.2d 1037, 1039 (6th Cir. 1991)).

The Supreme Court has explained "an accepted pleading standard" that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1969 (2007). The complaint "must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner*, 108 F.3d at 88 (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)). In

*Twombly* the Supreme Court emphasized that:

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

550 U.S. at 555, 127 S.Ct. at 1964-65 (citations omitted).

The Supreme Court has recently clarified that *Twombly* is not limited "to pleadings made in the context of an antitrust dispute." *Ashcroft v. Iqbal*, __ U.S. ___, 129 S.Ct. 1937 (2009). The Court emphasized that "though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of Rule 8. That Rule in turn governs the pleading standard 'in all civil actions,' and it applies to antitrust and discrimination suits alike." ___ U.S. at ___, 129 S.Ct. at 1953 (quoting *Twombly*, 550 U.S. at 555-556, 127 S.Ct. 1955).

### III. Analysis

Defendants Rodney Randall and MTC assert two main arguments in support of their motion to dismiss. First, they argue that the plain, unambiguous language of the License Agreement provides that royalty payments will only be made for five years. Therefore, they argue, Moran has no right to any future royalty payments as the License Agreement had been in effect for more than five years. Second, these Defendants argue that as a matter of law, a franchisor who terminates a franchise agreement, even where the franchisee is in breach and even under the explicit terms of the franchise agreement, is not entitled to future royalty payments because the franchisee's breach is not the proximate cause of the loss of future

royalties.

The court will address these arguments in turn. The parties agree that Tennessee law applies in interpreting the Randall Franchise Agreement, and the License Agreement itself states that Tennessee law will apply. License Agreement, § 32.

Under Tennessee common law, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Tennessee courts have made clear that " 'a contract can be express, implied, written, or oral, 'but an enforceable contract must result from a meeting of the minds in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and must be sufficiently definite to be enforced.'" *Ferguson v. Nationwide Property & Cas. Ins. Co.*, 218 S.W.3d 42, 49 (Tenn. Ct. App. 2006) (quoting *Thompson v. Hensley*, 136 S.W.3d 925, 929-30 (Tenn. Ct. App. 2003)).

In interpreting contracts in Tennessee, the Tennessee Supreme Court has explained:

> A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties. Courts must look to the plain meaning of the words in a contract to determine the parties' intent. If the contractual language is clear and unambiguous, the literal meaning controls; however, if the words are ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. In such circumstances, "the court must apply established rules of construction to determine the intent of the parties."

*Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. Sup. Ct. 2009) (quoting *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. Sup. Ct. 2006)) (other citations omitted).

As the Tennessee Supreme Court explained in *Watson*,

> This Court's initial task in construing [a contract] at issue is to determine whether the language is ambiguous. If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language.
>
> Contractual language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." . . . When contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties. An ambiguous provision in a contract generally will be construed against the party drafting it. Furthermore, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract.

195 S.W.3d at 611-12 (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. Sup. Ct. 1975)) (other citations omitted).

With respect to awarding damages for breach of contract, Tennessee courts have explained that:

> The purpose of assessing damages in the event of a breach of contract is to place the injured party in the same position it would have been in had the contract been fully performed. The mere fact a party breaches a contract does not entitle the other party to an award of damages. The injured party must sustain damages that consequently result from the breach. Moreover, the injured party is not entitled to profit from the breach or be placed in a better position than had the contract been fully performed.

*Metropolitan Government of Nashville and Davidson County v. Cigna*, 195 S.W.3d 28, 35 (Tenn. Ct. App. 2005) (citing *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990); *Great American Music Mach., Inc. v. Mid-South Record Pressing Co.*, 393 F.Supp. 877, 885 (M.D. Tenn. 1975)) (other citations omitted); *see also, GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005).

Tennessee courts also recognize a right to lost profits in some circumstances. In *Waggoner Motors, Inc. v. Waverly Church of Christ* the Tennessee court of appeals provided

-9-

some guidelines pertaining to lost profits:

> Injured parties seeking to recover damages for lost anticipated profits have traditionally faced an uphill climb. The traditional rule was that anticipated damages of a commercial business are too speculative and dependent on changing circumstances to warrant a judgment for their loss. Now, however, the courts recognize that an injured party may recover lost anticipated profits when their nature and occurrence have been established with reasonable certainty.
>
> The reasonable certainty standard applies chiefly to the evidence regarding the existence of damages. It is a flexible standard that permits the courts to take the particular facts of each case into consideration. The existence of damages has been proven with reasonable certainty when the mind of a prudently impartial person is satisfied that the injured party has been damaged. . . .
>
> An award for lost profits damages depends on whether the evidence provides a satisfactory basis for estimating what the injured party's probable earnings and expenses would have been had the wrongdoing not occurred. Since lost profits can rarely be computed down to the last penny, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been. . . .
>
> Damages for lost profits must be based on net profits, not on gross revenues or on gross profits.

159 S.W.3d 42, 58-59 (Tenn. Ct. App. 2004).

Defendants MTC and Rodney Randall first argue that the plain unambiguous language of the contract states that future royalty payments are only due during the first five years of the License Agreement. Section 10 of the License Agreement states:

> Beginning at the time that LICENSEE opens its center for business through the first five (5) years of this Agreement, LICENSEE shall pay to LICENSOR, in weekly amounts, service charges in a sum equal to seven percent (7%) of the gross receipts derived from the operation of LICENSEE'S Service Center during the preceding calendar week. (As provided in paragraph number 3, this service charge may be increased by the LICENSOR each five-year period of this Agreement.)

License Agreement, § 10. As noted earlier, paragraph 3 does not appear to contain any information regarding increased royalty fees. Although MTC and Rodney Randall emphasize

-10-

the plain meaning of the first sentence of Section 10, they ignore the parenthetical sentence of Section 10. The first sentence appears to relate solely to the first five years of the License Agreement. However, the parenthetical sentence appears to suggest that the franchisee's royalty fee may, not be completed, as suggested by Defendants, but may *increase* in amount from 7% to another, higher number. The lack of information regarding royalty rates in paragraph 3 of the License Agreement merely serves to add to the confusion regarding what the parties intended.

In addition, the Addendum entered into by the Defendants and Mr. Transmission, Inc. in 1989 serves to add further context to Section 10. *See* Addendum. The Addendum provides that the 7% service charge described in Section 10 is decreased to 5% for certain work undertaken by the franchisee. The Addendum would be nonsensical if the License Agreement had been interpreted by the parties in the way suggested by the Defendants. If the Defendants' obligation to pay royalties had ended in 1987, based on the 1982 commencement of the License Agreement, the court wonders why the Defendants would have entered into an Addendum "reducing" the 7% service charge to 5%.

The court concludes that Section 10, when read in its entirety with the parenthetical sentence and the Addendum, is ambiguous. Because the License Agreement is inherently ambiguous, the court may turn to parol evidence to help to illuminate the parties' intent. *See Watson*, 195 S.W.3d at 611-12. Further development of the facts pertaining to the parties' contracting relationship, including whether MTC and Rodney Randall paid royalty fees beyond the first five years of the License Agreement, will add to this court's understanding of the parties' intent in interpreting the contract. Therefore, the court concludes that Defendants' motion to dismiss cannot be granted based on a plain meaning of the contract.

Defendants MTC and Rodney Randall also argue that franchisors are not entitled to future lost royalty payments as a matter of law where the franchisor terminated the franchise agreement due to the franchisee's breach. The parties have cited a few decisions relating to franchisor/franchisee disputes from various jurisdictions. These cases serve to illustrate the variety of responses of various courts to franchisors' claims for future unpaid royalties following termination of a franchise agreement. The parties cite one case involving future royalties in a franchise agreement applying Tennessee law. *See Shoney's, Inc. v. Morris*, 100 F.Supp.2d 769 (M.D. Tenn. 1999). In *Shoney's* the district court granted the franchisor summary judgment against the franchisee due to the franchisee's breach of contract in closing its restaurants without executing a standard termination agreement. *Id.* at 771. The license agreements provided that "if the licensee ceases to operate its restaurant, then the licensee shall pay the licensor damages for the right to receive royalty fees for each year remaining on the original term of the agreement." *Id.* at 775. The franchisee argued that the provision was against public policy and unconscionable. *Id.* The court disagreed and determined that the future royalties clauses were enforceable. *Id.* at 776-77.

The Tennessee court relied on a California case on which Defendants MTC and Rodney Randall also rely. *See Postal Instant Press, Inc. v. Sealy*, 43 Cal.App.4th 1704, 51 Cal.Rptr.2d 365 (1996). In *Sealy* the court determined that the franchisor was not entitled to future royalties because it found that the franchisee's breach of the franchise agreement was not the proximate cause of the franchisor's loss of such royalties. *Id.* at 1706. In that case the franchisees became delinquent on their royalty and advertising fee payments. *Id.* at 1707. The franchisor viewed the failure to make the payments timely as a material breach and terminated the franchise agreement,

requesting the franchisees to cease operating their printing store. *Id.* The franchisor then filed suit for breach of contract against the franchisees seeking both past and future royalty payments. *Id.* at 1707-08.

In supporting its decision to deny the franchisor future royalty fees for lack of proximate cause, the court noted:

> Nothing in the franchisee's failure to pay past royalties in any sense prevented the franchisor from earning and receiving its future royalty payments. No, it was the franchisor's own decision to terminate the franchise agreement that deprived it of its entitlement to those future royalty payments. At worst, if the franchisor had not terminated the franchise agreement it might have been required to sue again or perhaps again and again to compel the franchisee to pay those future royalties in a timely fashion as those royalties accrued.

*Sealy*, 43 Cal.App.4th at 1710-11. The court continued by emphasizing that the franchisor had chosen to terminate the agreement, thus depriving itself of future royalties. *Id.* at 1713. The court further explained that "we wish to make it clear we are not holding franchisors can never collect lost future royalties for franchisees' breaches of the franchise agreement. That entitlement depends on the nature of the breach and whether the breach itself prevents the franchisor from earning those future royalties." *Id.*

Defendants MTC and Rodney Randall also cite a series of cases relating to franchise agreements in North Carolina. *See Meineke Car Care Centers, Inc. v. RLB Holdings, LLC*, No. 3:08cv240-RJC, 2009 WL 2461953 (W.D.N.C. Aug. 10, 2009) ("*Meineke I*"); *Meineke Car Care Centers, Inc. v. L.A.C. 1603, LLC*, No. 3:08cv73, 2008 WL 1840779 (W.D.N.C. Apr. 23, 2008) ("*Meineke II*"); *Meineke Car Care Centers, Inc. v. Duvall*, No. 3:06cv180W, 2007 WL 1100841 (W.D.N.C. Apr. 12, 2007) ("*Meineke III*"). In *Meineke I* the court denied the franchisor future royalty payments finding that the franchise agreement did not provide for

prospective payments upon termination of the agreement. 2009 WL 2461953 at *5. It further found that the franchisor terminated the franchise agreements, making it impossible for the franchisee to generate future royalties:

> Meineke's termination of the [franchise agreements] in the instant case terminated the Defendants' ability to generate royalties and fees, irrespective of whether Defendants had breached before Meineke terminated. Meineke had the sole right to terminate under the [franchise agreement]. Once it did, the contract provided no right to future damages. Since franchisee's contributions were based on their revenues, the termination of the franchise agreement cut off the Defendants' ability to generate liability for royalty fees or advertising fund fees.

*Id.* at *5. The court further denied the franchisor lost profits finding that any profits were too speculative because the franchises had suffered several years of unprofitability and the franchisor had not demonstrated an effort to mitigate lost profits. The court in *Meineke II* essentially made the same finding that the franchise agreement did not provide for the recovery of prospective fees and that by terminating the franchise agreement, the franchisor had made it impossible for the franchisee to generate any future revenues. 2008 WL 1840779 at *1. *See also, Meineke III* (no prospective profits for franchisor on breach of franchise agreement claim where franchise had been operating at a net loss).

The court's decision in *Sealy* has come under scrutiny from courts and commentators alike in recent years. *See e.g.,* Robert L. Ebe, David L. Steinberg, & Brett R. Waxdeck, *Radisson and the Potential Demise of the Sealy-Barnes-Hinton Rule*, 27 Franchise L.J. 3, 5 (2007). Some courts, like the district court in *Burger King Corp. v. Hinton, Inc.*, have adhered to the reasoning expressed in *Sealy*. 203 F.Supp.2d 1357, 1366 (S.D. Fla. 2002) (finding that franchisor's decision to terminate the franchise agreement due to franchisee's breach in failing to pay fees was the proximate cause of loss of future profits). *See also, Kissinger, Inc. v. Singh*,

304 F.Supp.2d 944, 950-51 (W.D. Mich. 2003) (applying reasoning of *Sealy* in denying franchisor's motion for summary judgment regarding future lost royalties); *I Can't Believe It's Yogurt v. Gunn*, No. Civ.A. 94-OK-2109-TL, 1997 WL 599391, at *23-24 (D. Col. Apr. 15, 1997) (same).

However, other courts have rejected the *Sealy* reasoning. For example, in *American Speedy Printing Centers, Inc. v. AM Marketing, Inc.* the Sixth Circuit affirmed the district court's award of $115,616.12 in lost future profits/royalties. 69 F.App'x 692, 2003 WL 21580384 (6th Cir. July 8, 2003). In response to the franchisee's argument that the franchisor was requesting inconsistent remedies, the Sixth Circuit disagreed:

> We agree with the district court and find that [the franchisor] requests consistent remedies. . . . It is clear from the plain language of both the franchise agreement and the complaint filed in this action that by the time [the franchisor] filed the complaint, it had already terminated the agreement in response to [the franchisee's] breach. [The franchisor] seeks injunctive relief to stop [the franchisee] from using its marks or holding itself out as a franchise owner, and monetary compensation in the form of lost profits/royalties for defendants' actual breach of the agreement that has already occurred–entirely consistent remedies for separate and distinct injuries. The assignment of error is without merit.

2003 WL 21580384 at *6. Applying Michigan law, the Sixth Circuit determined that the franchisor's future lost royalties were not too speculative and could be awarded because the franchisor "is entitled to all damages necessary to be put in a position equivalent to that in which it would find itself if the agreement continued in effect for the full twenty years." *Id.*

In *Burger King Corp. v. Barnes*, issued by the same judge as in the *Hinton* case, the court allowed the franchisor to obtain lost future royalties because the franchisee had abandoned the franchise. 1 F.Supp.2d 1367 (S.D. Fla. 1998). In *Progressive Child Care Sys., Inc. v. Kids 'R' Kids Int'l, Inc.*, the Texas appellate court addressed a situation in which a franchisee ceased

making royalty payments under the franchise agreement and then began operating the franchises under a new operating name. No. 2-07-127-CV, 2008 WL 4831339, at *1 (Tex. Ct. App. Nov. 6, 2008). In affirming a jury award for lost future royalties, the court noted that the franchisor had not failed to comply with the franchise agreement, but that the franchisee had stopped paying royalties and had begun to run the child-care franchise under a new name. *Id.* at *4. The court upheld a jury award of $1,384,008.72 for lost royalties based on the lost royalties through the unexpired term of the franchise agreement. *Id.* at *6. In *Maaco Enter., Inc. v. Cintron*, the court awarded $164,326.22 in lost future royalty fees to the franchisor where the franchisee failed to make required payments under the agreement. No. CIV.A.99-CV-5935, 2000 WL 669640 (E.D. Pa. May 17, 2000). In determining the franchisor's right to lost future royalties, the court noted "[u]nless required to pay future royalties, defendants will have derived a great deal of benefit from [the franchisor] and use of its business system without paying the bargained for consideration." *Id.* at *4.

In a recent case a federal district court described the various approaches taken by courts with respect to requests for lost future royalties in breach of franchise agreement cases:

> Courts have generally permitted a franchisor to recover future royalties when the franchisee terminates, repudiates, or abandons the franchise. But courts have been hesitant to award future royalties under a multi-year franchise agreement when there is possible double-recovery, uncertainty in the existence and amount of future royalties, and inability to determine what portion of lost royalties were actually lost profits and not costs attendant to maintaining the franchise relationship.

*Kiddie Academy Domestic Franchising LLC v. Faith Enterprises DC, LLC*, No. WDQ-07-0705, 2010 WL 673112, at *5 (D. Md. Feb. 22, 2010) (citing Robert L. Ebe, David L. Steinberg, & Brett R. Waxdeck, *Radisson and the Potential Demise of the Sealy-Barnes-Hinton Rule*, 27

Franchise L.J. 3, 5 (2007)) (other citations omitted). The court denied the franchisor's motion for summary judgment regarding entitlement to lost future royalties because the franchisor had failed to provide the court with sufficient evidence for it to "make a fair and reasonable estimate of the amount of future royalties." *Kiddie Academy*, 2010 WL 673112 at *6.

In their 2007 law review article on the subject, *Radisson and the Potential Demise of the Sealy-Barnes-Hinton Rule*, the authors summarize the "lack of consensus" in courts regarding a franchisor's right to future lost royalties and then argue:

> that what we call the *Sealy/Barnes/Hinton* rule does not make sense. That rule, which basically allows future damages if the franchisee, but not the franchisor, terminates (even if the franchisee has committed continuing uncured breaches), elevates form over substance by failing to properly analyze proximate causation and, in many cases, properly apply principles of mitigation to avoid excessive damages. We suggest instead an approach more consistent with basic contract principles under which future lost profit damages should be available if, at the time of contracting, the parties might reasonably have foreseen that such losses would be the probable result of the franchisee's breach. However, whether or not the agreement granted the franchisee an exclusive territory, a franchisor should not recover lost profits that the franchisee proves could have been either avoided by installing a replacement franchisee or otherwise mitigated.

Robert L. Ebe, David L. Steinberg, & Brett R. Waxdeck, *Radisson and the Potential Demise of the Sealy-Barnes-Hinton Rule*, 27 Franchise L.J. 3, 3 (2007).

The approach the authors believe follows basic principles of contract law more faithfully is outlined by the district court in *Radisson Hotels Int'l, Inc. v. Majestic Towers, Inc.*, a case involving breach of a hotel franchise agreement. 488 F.Supp.2d 953 (C.D. Cal. 2007). In that case the franchise agreement contained a liquidated damages clause outlining damages that the franchisee would bear if the franchisor terminated the agreement due to the fault of the franchisee. *Id.* at 956. The court analyzed the *Sealy* decision and distinguished the hotel franchise agreement from the agreement at issue in *Sealy*. *Id.* at 962-63. In contrast to the

agreement in *Sealy*, the hotel franchise agreement specifically contemplated liquidated damages based on the franchisor's termination of the agreement due to the franchisee's failure to pay royalties. *Id.* In addition, however, the court noted in a footnote:

> Alternatively, this Court believes that the *Sealy* decision is mistaken. . . . The *Sealy* court based its proximate cause analysis on a single case involving a licensor-licensee relationship decided by another intermediate California appellate court in 1931. In this Court's view, the *Sealy* Court's holding that a franchisor has no remedy but to sue the franchisee over and over again as lost royalties accrue is simply untenable. . . . the Court believes that where a franchisee breaches a contract and demonstrates that is it unable or unwilling to meet its obligations, lost future profits are a proximate result of the breach because the franchisee's actions are a "substantial factor in bringing about that loss or damage." Thus, this Court does not find *Sealy* to be persuasive.

*Id.* at 963, n. 10 (citing *Sealy*, 43 Cal.App.4th at 1712-13; *Fageol & Tate v. Baird-Bailhache Co.*, 138 Cal.App. 1, 5 P.2d 75 (1931); *US Ecology, Inc. v. State*, 129 Cal.App.4th 887, 909-10, 28 Cal.Rptr.3d 894 (2005)).

The discussion of cases reviewing franchise agreements, *supra*, serves to elucidate the importance that courts place on the individual facts of each situation in determining whether a franchisor will be entitled to lost future royalty payments. These cases demonstrate that courts disagree on the manner in which proximate cause should be analyzed and how much it matters whether the franchisor terminated the agreement or simply sued the franchisee for breach of the agreement.

Defendants MTC and Rodney Randall are seeking to dismiss a significant portion of the damages requested in this action at a very early stage. The motion to dismiss is based solely on the pleadings, and thus, the court has very little evidence to consider in determining whether to dismiss such a significant part of Moran's case. The Amended Complaint alleges that Rodney Randall contemplated retirement from operation of the Mr. Transmission franchise, but instead

-18-

of transferring his obligations under the Randall Franchise Agreement to his son, he "abandoned" the agreement. Moran further contends that Rodney Randall then transferred the assets of the franchise to his son, Jason Randall, and Jason began operating JRT, an automotive transmission business, at the same location as the former Mr. Transmission franchise. Amended Complaint, ¶ 31-33. JRT is still allegedly in operation and continues to use Moran's proprietary marks in advertising the business. Thus, MTC and Rodney Randall allegedly signaled their unwillingness to continue paying royalties by ceasing to operate the franchise. Rodney Randall informed Moran of his intent to retire without ever answering Moran's inquiries regarding how termination of the Randall Franchise Agreement would be handled. He then allegedly gave his successful business to his son who took over the automotive transmission business, assuming he would be free from any need to pay Moran royalty and advertising fees.

Based on the facts as alleged by Moran, the court cannot say at this early stage of the litigation that Moran has not made factual allegations "with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner*, 108 F.3d at 88. Tennessee law provides for damages for lost profits in some circumstances. Moran's alleged facts raise its claim to lost future royalties above the speculative level as required by *Twombly*. It is clear from a review of case law that even the *Sealy* decision does not preclude future lost royalty damages where a franchisee has clearly abandoned the franchise.

The court concludes that a dismissal of Moran's damages request for lost future royalties would be premature at this very early stage of the case. This court will need more factual evidence to clarify the circumstances surrounding the parties' termination of the franchise relationship to determine whether MTC and Rodney Randall can be relieved of liability for lost

future royalties.  For these reasons, Defendants MTC's and Rodney Randall's motion to dismiss will be **DENIED**.

## IV. Conclusion

As described *supra*, Defendants MTC and Rodney Randall's motion to dismiss will be **DENIED**.

A separate order will enter.


                               */s/ R. Allan Edgar*
                               R. ALLAN EDGAR
                     UNITED STATES DISTRICT JUDGE